O

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| BEVER-LEIGH B. PENNEY,<br><br>    Plaintiff,<br>  v.<br>NDEX WEST LLC et al.,<br><br>    Defendant. | Case No. 2:11-cv-5567-ODW (MANx)<br><br>**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [127]** |

## I. INTRODUCTION

Plaintiff Bever-Leigh Penney's case is not unique among the litany of mortgage-foreclosure cases this Court and this district see and have seen on a regular basis since 2008. Penney fell upon hard times and was unable to make her full mortgage payments to her bank, Defendant Wells Fargo. Wells Fargo, through its agent, recorded a Notice of Default and Election to Sell Under Deed of Trust, thereby initiating the foreclosure process. Penney applied for a loan modification but was denied. She now alleges several fraud-based claims, contending that Wells Fargo promised not to refer her to foreclosure while her request was pending. Given that Wells Fargo warned Penney that the foreclosure process would have to continue once it began, all three of her claims fail as a matter of law. Consequently, the Court **GRANTS** Wells Fargo's Motion for Summary Judgment.

/ / /

## II. FACTUAL BACKGROUND

On May 19, 1998, Plaintiff obtained a fixed-rate mortgage loan for $269,500.00 from DiTech Funding Corporation; this loan was secured by a deed of trust encumbering the property located at 9404 Wayside Drive, Shadow Hills, California 91040. (RFJN Ex. A.) This property included two parcels of real property identified as APN 2549-016-001 ("Lot 001") and APN 2549-016-004 ("Lot 004"). (RFJN Ex. B.) In connection with the loan, Plaintiff executed a promissory note whereby she agreed to make fixed payments of $1,884.38 per month. (RFJN Ex. A; Penney Dep. 26:4–12, Sept. 20, 2012.)

DiTech assigned the Deed of Trust to GE Capital Mortgage Services who then ultimately assigned it to Wells Fargo on March 8, 2005. (RFJN Ex. C, D.) The assignment to Wells Fargo was recorded on April 6, 2005. (RFJN Ex. D.)

Between July 1, 2010, and November 16, 2010, Plaintiff made various mortgage payments totaling $9,026.01, including a $700.00 payment in August 2010 and a $550.00 payment in November 2010 (Penney Decl. Ex. 3), both of which fell below her fixed, $1,884.38 monthly payments. As of December 29, 2010, Plaintiff was in default on her mortgage in the amount of $15,192.28.[1] (Penney Decl. Ex. D.)

On December 30, 2010, as a result of Plaintiff's default, a Notice of Default and Election to Sell Under Deed of Trust was recorded in the Los Angeles County Recorder's Office. (*Id.*)

The Notice of Default began, "If your property is in foreclosure because you are behind in your payments it may be sold without any court action . . . . No sale date may be set until three months from the date this Notice of Default may be recorded . . . ." (*Id.* at 1.) The Notice also made multiple references to foreclosure,

---

[1] Penney contends this figure is grossly overstated. Concerned by what appeared to be an excessively large default when viewed in relation to Penney's fixed monthly payments, the Court ordered Wells Fargo to submit further information supporting its default calculation. (ECF No. 154.) Upon review of Wells Fargo's February 11, 2013 response (ECF Nos. 155, 156), the Court is satisfied Wells Fargo accurately computed Penney's default.

1  such as "[w]hile your property is in foreclosure," "the obligation being foreclosed
2  upon," "to stop the foreclosure," and "[n]othwithstanding the fact that your property is
3  in foreclosure." (*Id.* at 1–2.)

4  Beginning in February 2011, Wells Fargo phone representatives initially
5  informed Plaintiff that "no foreclosure proceedings would take place on Plaintiff's
6  property, starting from the time Defendant Wells Fargo received an application from
7  Plaintiff for a U.S. Government HAMP (Home Affordable Mortgage Program) loan
8  modification, and continuing throughout the entire period of the loan modification
9  process."

10  On February 7, 2011, Plaintiff listed the vacant portion of her lot, Lot 004, with
11  a real-estate agent with the intent to sell the land in order to rectify the arrearage on
12  her mortgage. (Penney Dep. 95:22–23; Harb Dep. 13:11–25, Nov. 12, 2012.) She
13  received one offer, but no sale ever occurred. (Penney Dep. 97:1–5.) At no point did
14  she attempt to sell the occupied portion of the property. (*Id.* at 97:15–22; Harb Dep.
15  14:1–2.)

16  Penney wrote to Wells Fargo requesting consideration for HAMP on both
17  April 17 and July 15, 2011. (Penney Decl. Ex. T.)

18  In advance of her later written request for HAMP consideration, on both March
19  24 and April 9, 2011, Penney received identical letters and HAMP packets from Wells
20  Fargo. (Penney Decl. Exs. A, B, Q, R.) The HAMP packet said, "While we're
21  reviewing your information, your home will not be referred to foreclosure or sold at a
22  foreclosure sale." (*Id.* at Exs. A, B.) But the letter stated, "During the HAMP
23  evaluation process: If your loan has been previously referred to foreclosure, we are
24  obligated* to continue the foreclosure process while it is evaluated for a HAMP
25  modification." (*Id.* at Exs. Q, R.) The asterisk refers to a statement that the "decision
26  to stop the foreclosure process or sale is made by the investor." (*Id.*)

27  / / /
28  / / /

On May 25, 2011, Wells Fargo's Loss Mitigation Department informed Penney that a trustee's sale had been scheduled for June 9, 2011. (Penney Decl. Ex. X.) However, no sale occurred on that date.

Wells Fargo sent another letter to Penney on June 30, 2011 that said, "As of the date of this letter your loan is in active foreclosure." (*Id.* at Ex. E.)

On April 2, 2012, a Home Preservation Specialist sent Penney a letter informing Penney that she did not meet the HAMP requirements because her "pending loan modification required approval from the investor that ultimately own[ed] [her] mortgage, and the investor . . . declined the request to modify [her] mortgage." (*Id.* at Ex. H.) The letter also said that if her mortgage had previously been referred to foreclosure, that process would move forward at that time. (*Id.*)

On June 8, 2011, Penney filed a Complaint in Los Angeles Superior Court against Wells Fargo and NDeX West, LLC, alleging three different claims. (ECF No. 1, Ex. A.) Wells Fargo removed the case to this Court on July 6, 2011. On October 18, 2011, the Court granted Penney leave to amend her Complaint (ECF No. 29), and she filed her First Amended Complaint the same day. (ECF No. 30.) The Complaint alleged 12 claims against Wells Fargo, NDeX West, Stewart Lender Services, Sherry Doza, Tipi Robertson, LSI Title Company, Menghong But, Ric Juarez, and Kellie C. Boswell. (*Id.*)

Upon Defendants' November 1, 2011 motion to dismiss (ECF No. 32), the Court dismissed all but Penney's seventh claim for negligence on February 22, 2012. (ECF No. 63.) Penny filed her Second Amended Complaint on March 12, 2012. (ECF No. 68.) Wells Fargo, NDeX West, and LSI again moved for dismissal on March 27, 2012. (ECF No. 69.) On June 6, 2012, the Court granted the Motion with respect to all but Penney's promissory-estoppel, promissory-fraud, and fraudulent-misrepresentation claims. (ECF No. 101.) The Court also foreclosed reference to any supposed reliance damages resulting from filing this lawsuit or abstention from other foreclosure-avoidance options besides loan modification. (*Id.* at 9–10.)

Finally, a third Notice of Trustee's Sale was executed on September 20, 2012, and the property was ultimately sold on October 25, 2012. (*Id.* at Exs. 1, 9.)

Wells Fargo, the only remaining Defendant, then moved for summary judgment on December 14, 2012. (ECF No. 127.) Penney filed her Opposition on January 9, 2013 (ECF No. 141), and a hearing on the Motion was held on January 28, 2013. (ECF No. 151.) That Motion is now before the Court for decision.

### III. LEGAL STANDARD

Summary judgment should be granted if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The moving party bears the initial burden of establishing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986). Once the moving party has met its burden, the nonmoving party must go beyond the pleadings and identify specific facts through admissible evidence that show a genuine issue for trial. *Id.*; Fed. R. Civ. P. 56(c). Conclusory or speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment. *Thornhill's Publ'g Co. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir. 1979).

A genuine issue of material fact must be more than a scintilla of evidence, or evidence that is merely colorable or not significantly probative. *Addisu v. Fred Meyer*, 198 F.3d 1130, 1134 (9th Cir. 2000). A disputed fact is "material" where the resolution of that fact might affect the outcome of the suit under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1968). An issue is "genuine" if the evidence is sufficient for a reasonable jury to return a verdict for the nonmoving party. *Id.* Where the moving and nonmoving parties' versions of events differ, courts are required to view the facts and draw reasonable inferences in the light most favorable to the nonmoving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007).

///

///

## IV. DISCUSSION

Penney contends that Wells Fargo repeatedly promised that it would not refer her mortgage to foreclosure until the HAMP evaluation was complete. By continuing with foreclosure during that period, Penney claims Wells Fargo breached its promise. She brings claims for promissory estoppel, promissory fraud, and fraudulent misrepresentation. In response, Wells Fargo asserts that its myriad written communications to Penney make clear that once the foreclosure process began in December 2010 with the execution of the Notice of Default, it would and did continue during Penney's HAMP evaluation. What's more, the property was not ultimately sold until October 2012, which was after Penney's HAMP request was denied in April 2012. The Court considers each of these claims and the parties' respective arguments in turn.

**A.     Promissory Estoppel**

To state a claim for promissory estoppel, Penney must allege (1) a promise clear and unambiguous in its terms; (2) reliance by Plaintiff on that promise; (3) reliance that was both reasonable and foreseeable; and (4) damages resulting from her reliance. *Boon Rawd Trading Int'l Co., Ltd. v. Paleewong Trading Co., Inc.*, 688 F. Supp. 2d 940, 953 (N.D. Cal. 2010); *Aceves v. U.S. Bank, N.A.* 196 Cal. App. 4th 218, 225 (2011). "[T]he doctrine of promissory estoppel is used to provide a substitute for the consideration [that] ordinarily is required to create an enforceable promise." *Raedeke v. Gibraltar Sav. & Loan Ass'n*, 10 Cal. 3d 665, 672 (1974).

*i.     Promise*

Penney claims that Wells Fargo promised both orally through its representatives and in several pieces of mail correspondence that it would not refer her mortgage to foreclosure during the HAMP evaluation process. She points to identical HAMP packets dated March 24 and April 9, 2011, which read in part, "While we're reviewing your information, your home will not be referred to foreclosure or sold at a foreclosure sale." (Penney Decl. Exs. A, B.) She also argues that she was not

informed that the foreclosure process had begun until she received a letter dated June 30, 2011, which said, "As of the date of this letter your loan is in active foreclosure." (Penney Decl. Ex. E.)

In response, Wells Fargo draws the Court's attention to the cover letters that accompanied the HAMP packets. They state that, during the HAMP evaluation period, Wells Fargo was obligated to continue with foreclosure once set in motion. (Penney Decl. Exs. Q, R.) Wells Fargo argues that Penney entered foreclosure in December 2010 upon the filing of the Notice of Default and Election to Sell Under Deed of Trust. Wells Fargo further contends that since Penney was already in foreclosure, it only agreed to not sell the property at a trustee's sale, and no such sale occurred until October 2012—over 6 months after Penney's HAMP request was denied.

The Court finds that there is no genuine issue of material fact as to whether Wells Fargo promised to not refer Penney to foreclosure during the HAMP evaluation period. Both parties submitted the HAMP packets and cover letters to the Court, and both cover letters expressly and conspicuously state that if Penney had already been referred to foreclosure, Wells Fargo was obligated to continue with that process.

Wells Fargo informed Penney in December 2010 that she was in foreclosure by filing the Notice of Default and Election to Sell Under Deed of Trust. Under California law, a notice of default is *required* in order to initiate foreclosure. Cal. Civ. Code § 2924(a)(1). What's more, the Notice also makes several references to "foreclosure." Penney contends that the first line of the Notice, that is, "If your property is in foreclosure because you are behind in your payments . . .," misled her into thinking she was not in foreclosure. But the "if" refers only to the possibility that she was in foreclosure "because [she was] behind in [her] payments." There is no indication that the whole Notice, and thus her foreclosure, was conditional.

///
///

1 Given all these warnings, no reasonable jury could find that Penney was not in foreclosure and, consequently, that Wells Fargo promised not to refer her to foreclosure.

Further, by Wells Fargo submitting the March 24 and April 9, 2011 cover letters in support of its Motion for Summary Judgment, it carried its burden of demonstrating an absence of a genuine issue of material fact. It was then incumbent upon Penney to rebut that presumption by proving that she did not receive the cover letters or that there was some other defect with them. The Court also gave Penny several chances at the January 28, 2013 hearing to adduce facts showing a genuine issue of material fact on this issue. She did not do so. Therefore, Penney did not carry her burden of proving a genuine, triable issue existed.

Even assuming, for the sake of argument, that Wells Fargo had not yet begun foreclosure when it sent Penney the March 24 and April 9, 2011 letters and packets, Wells Fargo still would not have breached any promise to Penney. In several letters sent to Penney, Wells Fargo promises that her property would not be sold at foreclosure during the HAMP evaluation period. While 2 notices of trustee's sale were executed during that time, no sale was ever held until October 2012—over six months after Penney's HAMP request was denied on April 2, 2012. Wells Fargo, therefore, lived up to its promise.

Because a claim for promissory estoppel requires, at the very least, a "clear and unambiguous promise," *Boon Rawd Trading Int'l Co.*, 688 F. Supp. 2d at 953, and because none has been proven here, Wells Fargo is entitled to judgment as a matter of law on Penney's promissory-estoppel claim.

   *ii.* *Reasonable and Foreseeable Reliance*

Penney's promissory-estoppel claim similarly fails because she did not establish that her reliance on any alleged promise was either reasonable or foreseeable.

"[D]etrimental reliance is an essential feature of promissory estoppel . . . ." *Healy v. Brewster*, 59 Cal. 2d 455, 463 (1963). Courts applying California law have

1 found detrimental reliance in the context of loan modifications where the plaintiff
2 procured a high-cost, high-interest loan, *Garcia v. World Sav., FSB*, 183 Cal. App. 4th
3 1031, 1041 (2010), where a plaintiff already in bankruptcy proceedings decided not to
4 seek Chapter 13 relief, *Aceves*, 192 Cal. App. 4th at 227, and where a plaintiff made
5 expensive improvements to her home instead of filing for bankruptcy, *Salcido v.*
6 *Aurora Loan Services*, 11-CV-02032-AHM (FFMx), 2012 WL 123280, at *4 (C.D.
7 Cal. Jan. 17, 2012).

8 Penney recites a litany of ways she supposedly relied upon Wells Fargo's
9 nonexistent promise not to foreclose upon her property. (Opp'n 13–16.) Many were
10 precluded by the Court's June 6, 2012 Order. Notably, she contends she refrained
11 from listing her full property (Lot 001 and Lot 004) and from borrowing from "willing
12 third-party sources." (*Id.* at 14.)

13 But Wells Fargo points out that Penney admitted she never sought third-party
14 financing  (Penney Dep. 112:8–16, 113:10–14, 116:2–5), nor did she have the
15 personal financial resources to bring her account up to date. (*Id.* at 117:23–118:23.)
16 Penney also never tried to sell the full property, which, Wells Fargo argues, would
17 have been futile anyway given Penney's inability to sell the vacant portion. Lastly,
18 Wells Fargo contends that any reliance by Penney on any supposed promises would
19 not be reasonable given the notice and warnings she received that informed her she
20 was in foreclosure.

21 The Court finds that there is no genuine issue of material fact regarding whether
22 Penney reasonably and foreseeably relied upon any alleged promises by Wells Fargo.
23 She has not carried her burden of proving that she had some realistic alternative to
24 foreclosure. While Penney's Opposition enumerates numerous alternatives she
25 supposedly forwent, she has not adduced any admissible *evidence* to prove these
26 options were viable. Rather, the evidence actually adduced points inexorably to the
27 conclusion that foreclosure and a trustee's sale were inevitable.
28 / / /

Given that there is no evidence to establish detrimental reliance, Wells Fargo is further entitled to judgment as a matter of law on the promissory-estoppel claim.

*iii. Damages*

As far as damages, Penney argues that Wells Fargo overstated the arrearage on the December 2010 Notice of Default by some $9,000. Penney does not know how the $15,192.28 figure was calculated, but she asserts that, taking into account the payments she made up to November 2010, the amount had to have been lower.

Wells Fargo does not do much to shed light on the computation issue either. It does contend, however, that no damages could have stemmed from any alleged promises because Penney went into default in 2010—months before the correspondence at issue and thus before any supposed promises.

The Court finds that there is no genuine issue of material fact as to whether Penney was in default on her mortgage. While Penney spent much time during the January 28, 2013 hearing pondering her computation conundrum, she misses the forest for the trees. Penney admitted she fell behind on her payments, so whether Penney was behind $15,000 or $15, the fact remains that Penney did not live up to her written promise to the bank. Wells Fargo was entitled to foreclose on the property, and it did just that.

Consequently, the Court **GRANTS** Wells Fargo's Motion for Summary Judgment on the promissory-estoppel claim.

**B. Promissory Fraud**

In promissory-fraud actions, "the essence of the fraud is the existence of an intent at the time of the promise not to perform it." *Benson v. Hamilton*, 126 Cal. App. 331, 336 (1932). California Civil Code section 1709 provides that "[o]ne who willfully deceives another with intent to induce him to alter his position to his injury or risk, is liable for any damage which he thereby suffers. "Section 1710 defines deceit as, among others, a promise "made without any intention of performing it."

/ / /

The California Supreme Court expounded the elements necessary for a promissory-fraud claim: "(a) misrepresentation (false representation, concealment, or nondisclosure); (b) knowledge of falsity (or 'scienter'); (c) intent to defraud, i.e., to induce reliance; (d) justifiable reliance; and (e) resulting damage." *Lazar v. Superior Court*, 12 Cal. 4th 631, 638 (1996) (internal quotations marks omitted). "The elements of fraud are similar to the elements of promissory estoppel, with the additional requirements that a false promise be made and that the promisor know of the falsity when making the promise." *Aceves*, 192 Cal. App. 4th at 231.

Given that the Court finds that Wells Fargo did not make any promise to Penney sufficient to invoke promissory estoppel, by the same token, it did not make a promise with "intent to defraud" her either. *Lazar*, 12 Cal. 4th at 638. As already established above, the only promise Wells Fargo made to Penney was that it would not sell the property at a trustee's sale during the HAMP evaluation process. The bank kept up its end of the bargain: it did not sell the property until some six months after Penney's HAMP request was denied. Similarly, Penney's argument that Wells Fargo promised not to refer her to foreclosure while her HAMP request was pending similarly falters under promissory fraud due to the ample notification Penney received that she was already in foreclosure.

Further, Penney has not and cannot show that she justifiably relied on any promise or that she suffered any damages. Therefore, Wells Fargo is entitled to judgment as a matter of law on promissory fraud.

The Court **GRANTS** Wells Fargo's Motion for Summary Judgment as to this claim.

### C. Fraudulent Misrepresentation

Under California law, fraudulent misrepresentation encompasses several types of misrepresentations that are intended to deceive another person. Promissory fraud is just one such way. *See* Cal. Civ. Code § 1710. The elements a plaintiff must satisfy to establish fraudulent misrepresentation are the same as promissory fraud. *See Lazar*,

12 Cal. 4th at 644; *Perlas v. GMAC Mortg., LLC*, 187 Cal. App. 4th 429, 434 (2010). If a person engages in concealment or nondisclosure while meeting the other elements of deceit, a claim for fraudulent misrepresentation is established. *Lazar*, 12 Cal. 4th at 638.

Penney does not contend that Wells Fargo ever concealed anything from her. Nor can she show nondisclosure. At best, Penney contends that Wells Fargo did not disclose that she was already in foreclosure proceedings, but such an argument easily fails given the abundant written and oral notice she received.

Accordingly, the Court finds that Wells Fargo is entitled to judgment as a matter of law as to Penney's fraudulent-misrepresentation claim.

## V. CONCLUSION

For the reasons discussed above, Defendants' Motion for Summary Judgment is **GRANTED**. A judgment will issue.

**IT IS SO ORDERED.**

February 13, 2013

_____
**OTIS D. WRIGHT, II
UNITED STATES DISTRICT JUDGE**